UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| SAMINA K. YASMIN, individually, and as a representative of a Class of Participants and Beneficiaries of the General Mills 401(k) Plan,<br><br>Plaintiff,<br><br>vs.<br><br>GENERAL MILLS, INC.,<br><br>and<br><br>BOARD OF DIRECTORS OF GENERAL MILL, INC.,<br><br>and<br><br>BENEFITS FINANCE COMMITTEE OF GEN-ERAL MILLS, INC., CHRISTOPHER BRUNSON,<br><br>Defendants | Case No.  22-cv-02572 PJS/JFD<br><br><br>CLASS ACTION AMENDED COMPLAINT |

## AMENDED COMPLAINT

COMES NOW Plaintiff, Samina K. Yasmin ("Plaintiff"), individually and as rep-resentatives of a Class of Participants and Beneficiaries of the General Mills 401(k) Plan (the "Plan" or "General Mills Plan"), by her counsel, WALCHESKE & LUZI, LLC, and MILLER & STEVENS, P.A., as and for a claim against Defendants, alleges and

asserts to the best of her knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      Under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.      The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.      The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015).)

4.      Even in a defined contribution plan in which participants are responsible for selecting their plan investments, ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.)

"If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.*

5. Defendants, General Mills Inc. ("General Mills"), the Board of Directors of General Mills Inc. ("Board"), the Benefits Finance Committee of General Mills Inc. (collectively "Defendants"), and Christopher Brunson as the Vice President of Total Rewards at General Mills and Plan Administrator, are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 401(k) defined contribution pension plan – known as the General Mills 401(k) Plan (the "Plan" or "General Mills Plan") – that it sponsors and provides to its employees.

6. During the putative Class Period (October 14, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping fees," *Hughes*, 142 S. Ct. at 739-740, and by failing to remove their high-cost recordkeeper, Aon Consulting Inc./Alight Solutions ("Alight").

7. These objectively unreasonable recordkeeping fees cannot be contextually justified, and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8. Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive recordkeeping and administrative (RKA) fees, when considering "similar plans offering the same services for less." *See Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 279 (8th Cir. 2022).

9.      Defendant General Mills also engaged in self-dealing in violation of ERISA's duty of loyalty, Section 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), and fiduciary prohibited transaction provisions, Section 406(b)(1), 29 U.S.C. § 1106(b)(1), with regard to providing superfluous "plan administrator" services to the Plan and paying itself illicitly with plan assets.

10.     Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan RKA services.

11.     ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating RKA fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

12.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "[i]t would be perverse to require plaintiffs bringing [ERISA] claims to plead facts that remain in the sole control of the parties who stand accused of wrongdoing." *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 602 (8th Cir. 2009).

13.     The unreasonable RKA fees paid inferentially and plausibly establishes that an adequate investigation would have revealed to a reasonable fiduciary that the Plan services, given their level and quality, were improvident.

14.     These breaches of fiduciary duty, and violation of the prohibited transaction provisions, caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

15.     To remedy these fiduciary breaches and prohibited transactions, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

17.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

18.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

19.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the initial Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

20.     Plaintiff, Samina K. Yasmin, is a resident of the State of Wisconsin and currently resides in Greenfield, Wisconsin, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

21.     Plaintiff was a Machine Operator at their Milwaukee, Wisconsin location from February 2021 through August 2022.

22.     During the Class Period, Plaintiff invested in the 2035 Target Retirement Date Fund.

23.     Plaintiff has Article III standing to bring this action on behalf of the Plan because she suffered actual injuries to her Plan account through paying excessive RKA fees during the Class Period, and there is not any *de minimis* exception. *See Brandt v. Vill. of Winnetka, Illinois*, 612 F.3d 647, 649 (7th Cir. 2010) ("Standing exists when the plaintiff suffers an actual or impending injury, no matter how small; when that injury is caused by the defendant's acts; and when a judicial decision in the plaintiff's favor would redress that injury.") (citing *Summers v. Earth Island Institute*, 555 U.S. 488 (2009)); *Nohara v. Prevea Clinic Inc.*, 2022 WL 1504925, at \*2 (E.D. Wis. May 12, 2022) (same conclusion in materially identical ERISA fees case).

24.     Those injuries are fairly traceable to Defendants' unlawful conduct in maintaining Alight as its recordkeeper, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

25.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond her own injuries.

26.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA fees and fiduciary self-dealing) necessary to understand that Defendants breached their fiduciary duties and engaged in prohibited transactions until shortly before this suit was filed.

27.       Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets"), Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

28.       General Mills, Inc. ("General Mills") makes over a hundred brands of food in over a hundred different countries. Its brands include Cheerios, Pillsbury, and Haagen-Dazs, and is headquartered in Minneapolis, Minnesota Number 1 General Mills Blvd., Minneapolis, MN 55426. In this Complaint, "General Mills" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

29.       General Mills acted through its officers, including the Board of Directors, to perform Plan-related fiduciary functions in the course and scope of their business. General Mills and its Board appointed other Plan fiduciaries on the Benefits Finance Committee, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees.  For these reasons, General Mills and its Board are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

30.       The named administrative fiduciary for Plan is Christopher Brunson, who is the Vice President of Total Rewards at General Mill. The Benefits Finance Committee is the named financial fiduciary of the Plan.

31.     As the Plan Administrators, Mr. Brunson and Benefits Finance Committee are fiduciaries with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). Mr. Brunson and the Committee have authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

32.     The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that General Mills' contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

33.     In 2021, the Plan had about $4,817,815,290 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Alight to ensure that Alight remained the prudent and objectively reasonable choice.

34.     With 22,082 participants in 2021, the Plan had more participants than 99.94% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $4,817,815,290 in assets in 2021, the Plan had more assets than 99.96% of the defined contribution Plans in the United States that filed 5500 forms for the 2021 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

35. Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

36. Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

37. Although General Mills contributed significant amounts in employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping fees or other types of Plan expenses.

38. While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are a significant factor that affect plan participant's investment returns and impact their retirement income.

39. Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers, like recordkeepers, are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be prudent choices.

Recordkeeping and Administration ("RKA") Services

40.     Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with a prudent and materially identical level and caliber of services. Alight is one such recordkeeper.

41.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard bundled offerings of the materially identical level and quality as other recordkeepers who service mega plans.

42.     The fees charged by recordkeepers for RKA services are impacted by 1) the costs of providing the RKA services; 2) the competitive environment related to what other recordkeepers would charge to provide materially identical services; and 3) the revenues that a recordkeeper can generate from both the recordkeeping fees as well as other ancillary revenue based on the potential to manage proprietary investment options in the plan.

43.     All else being equal, the more participants a plan has, a recordkeeper will be able to provide a lower fee per participant to provide identical RKA services to maintain the same profit margin rate.

44.     As a result, it is axiomatic in the retirement plan services industry that the more participants in a plan, the lower the effective RKA fee per participant the

plan can negotiate. All prudent plan fiduciaries and their consultants and advisors are aware of this industry dynamic.

45.     There are two types of essential RKA services provided by all record-keepers. The first type, "Bundled RKA" services, include:

a.     Recordkeeping;

b.     Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.     Administrative Services related to converting a plan from one record-keeper to another recordkeeper;

d.     Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.     Maintenance of an employer stock fund;

f.     Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.     Plan consulting services including assistance in selecting the investments offered to participants;

h.     Accounting and audit services including the preparation of annual reports, e.g., Form 5500;

i.     Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan;

j.     Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules; and

k.      Trustee / custodian services.

46.     According to the November 2021 Important Information About Your Investment Options, Fees, and Other Expenses for the General Mills 401(k) Plan—Annual Fee Disclosure ("2021 404(a)(5) Notice), the Plan's RKA fees include "[a]sset-based fees are utilized to pay for investment management fees, trustee, legal, accounting, recordkeeping, and participant services, as well as other expenses relating to the maintenance of the Plan or investment funds." *Id.* at 1.

47.     Similarly, the First Amendment to the Administrative Service Agreement Between General Mills, Inc., and Hewitt Associates LLC ("First Amd. ASA"), contains a description of the "DC [defined contribution plan] Ongoing Services" which include, "Daily Plan processing, Coordinate with trustee for disbursements, Produce on-demand Participant statements, Produce quarterly Participant statements, and CSC Services." *Id.* at 28 (Schedule A – Fee Schedule).

48.     The Second Amendment to the Administrative Service Agreement Between General Mills, Inc., and Alight Solutions LLC ("Second Amd. ASA") provides the same list of "DC Ongoing Services," and adds additional language about the cost of call center services.

49.     The Plan thus provides all the standard Bundled RKA services just like all other similarly-sized mega 401(k) plans.

50.     The second type of essential RKA services, hereafter referred to as "A La Carte services," provided by all recordkeepers, often have separate, additional fees

based on the conduct of individual participants and the usage of the service by individual participants (usage fees). These "A La Carte RKA" services typically include the following:

    a.     Loan processing;

    b.     Brokerage services/account maintenance;

    c.     Distribution services; and

    d.     Processing of Qualified Domestic Relations Orders (QDROs).

51.     The sum of the total Bundled RKA fees plus the total A La Carte RKA fees equals the total RKA fees.

52.     According to the 2021 404(a)(5) Notice, the Plan provides a standard package of these A La Carte RKA fees. *Id.* at 2.

53.     In practice, there are no material difference between the services that are offered and provided by national recordkeepers.  Rather, some recordkeepers may differ in *how* they deliver the services.

54.     As an example, because the RKA offering are materially identical among all recordkeepers who provide services to large plans, like the General Mills Plan, it is the standard and prevailing practice for retirement plan consultants and advisors (experts in the retirement plan industry) to request quotes by asking what the recordkeeper's revenue requirement is on a per participant basis for providing the Bundled RKA services.

55.     Similarly, in most cases differences in fee rates for the A La Carte services are immaterial in determining the total fees charged by recordkeepers.  To the

extent that some recordkeepers have charged higher fees for these services, when those recordkeepers are in a competitive situation (in which they may not win the business), they will reduce their A La Carte fee rates to be competitive with what others are charging.

56.     The same is true for the Bundled RKA fee rates charged by recordkeepers. Retirement plan consultant and advisors primarily use the Bundled RKA fee rate of different recordkeepers to make fee rate comparisons and determine whether the Bundled RKA fee rate is reasonable.

57.     This approach is validated by the structure of the RFPs sent out by retirement plan consultants and advisors and the responses provided by the recordkeepers and then the summary of the evaluations created by the retirement plan consultants and advisors.

58.     For mega plans, like the General Mills Plan, any immaterial variations in the way certain services are received by one plan compared to another plan have an immaterial impact on the reasonable market rate for Bundled RKA services.

59.     As a result, comparisons of the fees paid by similar sized plans are meaningful and provide a reasonable basis for determining whether an inference of imprudence is warranted based on the RKA fees being paid by any specific plan.

60.     Additionally, any minor variation in the level and quality of Bundled RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

61. Since well before 2015, industry experts have maintained that for mega retirement plans like the General Mills Plan, prudent fiduciaries treat Bundled RKA services as a commodity with little variation in price. "Custody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and record-keeping services, the better for participants." Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (Feb. 10, 2015).

62. Industry experts know that recordkeeping services have become a commodity for retirement plan fiduciaries; virtually every major recordkeeper provide the same core services. See, e.g., Allen Steinberg, *Unchecked Revenue: Show Me the Fees*, https://blog.retireaware.com/2018/01/12/unchecked-revenue/ (last visited Sep. 15, 2022); Fred Barstein, Investment News, *Potential Pru Retirement Sale a Cautionary Tale of a 401(k) Innovator*, https://www.investmentnews.com/prudential-retirement-sale-cautionary-tale-innovatio-205453 (Apr. 20, 2021) ("It is no wonder, but certainly disappointing, that one of the industry's most innovative providers, Prudential Retirement, is reportedly exploring a sale. That highlights how much record keeping has become a commodity focused on scale and costs.").

63. Fidelity, the largest 401k recordkeeper in the country, has conceded that the RKA services that it provides to mega Plans are commodified, including to its own Plan for its own employees.

64.    As part of stipulated facts in another case, it stated: "The value of the recordkeeping services that Fidelity provided to the Plan in 2014 was $21 per participant; the value of the recordkeeping services that Fidelity provided to the Plan in 2015 and 2016 was $17 per participant, per year, and the value of the recordkeeping services that Fidelity has provided to the Plan since January 1, 2017 is $14 per participant, per year. *Had the Plan been a third-party plan that negotiated a fixed fee for recordkeeping services at arm's length with Fidelity it could have obtained recordkeeping services for these amounts during these periods. The Plan did not receive any broader or more valuable recordkeeping services from Fidelity than the services received by any other Fidelity-recordkept plan with at least $1 billion in assets during the Class Period (November 18, 2014 to the present).*" See *Moitoso v. FMR LLC, et al.*, 1:18-CV-12122-WGY, Stipulation of Facts, Dkt. 128-67, at 4-5 (D. Mass. Sep. 6, 2019) (emphasis added).

65.    All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are inconsequential from a cost perspective to the delivery of the Bundled RKA services.

66.    Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

67.     Plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

68.     Plan fiduciaries request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan.

69.     The General Mills Plan had a standard level of Bundled RKA services, providing recordkeeping and administrative services of a nearly identical level and quality to other recordkeepers who also serviced mega plans during the Class Period.

70.     There is nothing disclosed in the Participant section 404(a)(5) fee and service disclosure documents that suggests that the annual administrative fee charged to participants included any services that were unusual or above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans with more than $500,000,000 in assets.

71.     The General Mills 2021 404(a)(5) fee and service disclosure defines administrative fees in pertinent part as "[f]ees paid to the recordkeeper to cover expenses for services—recordkeeping, communication materials, Internet services, and assisting participants with transactions."

72.     Accordingly, comparisons of the RKA fees and the Bundled RKA fee Rate of different, similarly sized plans can provide meaningful information to help a plan fiduciary understand how its fees compare to a range of RKA fees without regard for minor and immaterial service level variation.

73.     By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the General Mills Plan. Reasonable recordkeeping fees paid in 2018 are representative of the reasonable fees during the entire Class Period. *See The Economics of Providing 401(k) Plans: Services, Fees, and Expenses, 2020*, ICI Research Perspective, at 4 (June 2021).

74.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

75.     The General Mills 2021 404(a)(5) fee and service disclosure defines "asset-based fees" as "[f]ees that are charged as a percent of holdings in an investment to cover investment management fees *plus any asset-based administrative service fees.* Asset-based fees are also referred to as the expense ratio, or, more technically, the fund's total annual operating expenses." (emphasis added).

76.     Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation." During the Class Period, Plaintiff and Class members paid both direct and indirect fees to Alight.

77.     The amount of compensation paid to recordkeepers must be *reasonable* (not the cheapest or the average in the market).

78.     Reasonable, in turn, depends on contextually understanding the market for such RKA services at the time that the recordkeeping contract or administrative services agreement ("ASA") is entered into with the recordkeeper, and then periodically thereafter.

## THE PLAN

79.     During the entire Class Period, the Plan received RKA services from Alight.

80.     At all relevant times, the Plan's RKA fees were objectively unreasonable and excessive when compared with the fees paid by other comparable 401(k) plans that had similar numbers of plan participants.

81.     The fees were also excessive relative to the level and quality of RKA services received since the same level and quality of services are provided to all mega plans, like the General Mill Plan, any minor variation with respect to the use of components of the standard offering 1) do not impact the Bundled RKA fee rates; and 2) are virtually always immaterial as it relates to the Total RKA fee rates and cannot reasonable explain the disparity between what the Plan paid and the market rate for the services received.

82.     This is true regardless of the specific service codes listed by the plan on the Form 5500. *See* Droblyen, *supra*; Steinberg, *supra*; Barstein, *supra*. For example, all recordkeepers provide communications to plan participants but Alight does not list service code "38 Participant communication" in the Plan's Form 5500.

83.     These excessive Plan recordkeeping fees led to lower net returns than the rates enjoyed by participants in comparable 401(k) plans.

84.    During the Class Period, Defendants breached their duty of prudence to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

85.    Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

86.    Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan. *See, e.g.,* U.S. DEPARTMENT OF LABOR, *Understanding Retirement Plan Fees and Expenses*, at 6, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-retirement-plan-fees-and-expenses.pdf (last visited Oct. 10, 2022) ("Once you have a clear idea of your requirements, you are ready to begin receiving estimates from prospective providers. Give all of them complete and identical information about your plan and the features you want so that you can make a meaningful comparison. This information should include the number of plan participants and the amount of plan assets as of a specified date.")

87.    Prudent plan fiduciaries can easily receive a quote from other recordkeepers to determine if their current level of recordkeeping fees is reasonable in light

of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

88.     It is the standard of care prevailing among industry experts to solicit competitive bids every three to five years. *See* CAPTRUST, *Understanding and Evaluating Retirement Plan Fees | Part One: A Holistic Approach*, https://www.captrust.com/understanding-and-evaluating-retirement-plan-fees-part-one-a-holistic-approach/ (stating "best practice is . . . a more formal recordkeeper search and selection process conducted approximately every three to five years. Recordkeeping and administrative fees should be evaluated and compared to plans of similar size and type that are receiving analogous services. While each plan is unique—making an apples-to-apples comparison imperfect—evaluating fees against similarly situated and sized plans provides a good reference point in helping to determine if plan fees are reasonable.").

89.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

90.     A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis.

91.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

92.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

93.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

94.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

95.     Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR BUNDLED RKA FEES AND THE PLAN THUS PAID UNREASONABLE BUNDLED RKA FEES

96.    A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

97.    During the Class Period, Defendants failed to regularly monitor the Plan's Total and Bundled RK&A fees paid to recordkeepers, including but not limited to Alight.

98.    During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Alight, in order to avoid paying unreasonable Total and Bundled RK&A fees.

99.    During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was ineffective given the objectively un-reasonable RKA fees it paid to Alight and in light of the level and quality of RKA services it received.

100.    As set forth in the table below, from the years 2016 through 2021, based upon information provided by the Plan fiduciaries to Plan participants in the 2021 General Mills 404(a)(5) participant fee disclosures provided to Plaintiff, the Plan paid an effective average annual Bundled RKA fee of $47 per participant. These amounts are calculated by the Plan's 404(a)(5) and ASA documents and indicate the Bundled

RKA fees.[1]

**Bundled Recordkeeping and Administration (Bundled RKA) Fees**

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | *Average* |
|---|---|---|---|---|---|---|---|
| Participants | 20,107 | 19,894 | 20,043 | 21,103 | 22,474 | 22,082 | *20,951* |
| Est. Bundled RKA Fees | $1,085,778 | $1,074,276 | $992,129 | $907,429 | $921,434 | $905,362 | *$981,068* |
| Est. Bundled RKA Per Participant | $54 | $54 | $50 | $43 | $41 | $41 | *$47* |

101.    From the years 2016 through 2021, based upon information derived from the 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans, the table and graph below illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual Bundled RKA fee of around $25 per participant for a materially identical level and quality of Bundled RKA services, if not lower.

**Comparable Plans' Bundled RKA Fees Based on Publicly Available Information**
(Participant Fee Disclosures or Form 5500s)

| Plan | Participants | Assets | Bundled RKA Fee ($) | Bundled RKA Fee ($/pp) | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Trinity Health 403(B) Retirement Savings Plan | 1,501 | $429,131,672 | $45,030 | $30 | Fidelity | White |
| JBS 401(K) Savings Plan | 14,255 | $311,864,034 | $285,100 | $20 | Empower | White |
| Team Health 401(k) | 17,237 | $1,280,891,222 | $430,925 | $25 | Schwab | White |
| **General Mills Plan Average Fee** | **20,951** | **$3,919,283,555** | **$981,068** | **$47** | **Aon/Alight** | **Red** |
| Beaumont Health 403(b) Plan | 38,668 | $2,643,820,272 | $1,082,704 | $28 | Fidelity | White |

---

[1] "Est. RKA Fees" on the above chart are taken directly from the audited Financial Statements attached to the General Mills 401(k) Plan Form 5500s. The amounts are recorded as "Administrative expenses" on the Statements of Changes in Net Assets Available for Benefits which are audited by KPMG an independent registered public accounting firm.

| General Dynamics Corporation 401(K) Plan 6.0 | 48,852 | $9,863,978,096 | $1,221,300 | $25 | Fidelity | White |
|---|---|---|---|---|---|---|
| Fidelity Retirement Savings Plan | 51,049 | $13,250,740,623 | $1,072,029 | $21 | Fidelity | White |

102.    The comparator Plans serviced by other recordkeepers and charged less received the same level and quality of services. For instance, the Trinity Health 403(b) Retirement Savings Plan received general administrative services just like the General Mills Plan in the form of "recordkeeping, legal, accounting, trustee, and other administrative fees," according to its 2021 plan participant fee disclosures. The same or similar language exists in the ERISA Section 404(a)(5) disclosures of the other comparator Plans above.

103.    From the years 2016 through 2021, the graph below illustrates the annual Bundled RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, compared to the average Bundled RKA fees paid by the Plan (as identified in the table above), with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



104.    The trend line (dashed white in the graph above) generated from these data points represent a reasonable estimate of the fee rate that several recordkeepers serving the mega market would be willing to accept in a competitive environment to provide Bundled RKA services to the Plan.

105.    From the years 2016 through 2021 and based upon information derived from 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans as well as publicly available information reported on 5500 forms and the accompanying financial statements, as compared to other Plans of similar sizes receiving a materially identical level and quality of Bundled RKA services, had Defendants been acting in the exclusive best interest of the Plan's participants, the Plan actually would have paid significantly less than an average of approximately $981,068 per year in Bundled RK&A fees, which equated to an effective average of approximately $47 per participant per year.

106.   From the years 2016 through 2021 and based upon information derived from the 404(a)(5) participant fee disclosure documents provided to participants in similarly sized plans as well as publicly available information reported on 5500 forms and the accompanying financial statements, as compared to other Plans of similar sizes receiving a materially identical level and quality of Bundled RKA services, had Defendants been acting in the best interests of the Plan's participants, the Plan actually would have paid on average a reasonable effective annual market rate for Bundled RKA of approximately $523,775 per year, which equates to approximately $25 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan Fiduciary would not agree to pay *almost twice more* than what they could otherwise pay for the materially identical level and quality of Bundled RKA services.

107.   From the years 2016 through 2021 and based upon information derived from 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its participants on average approximately $457,305 per year in unreasonable and excessive Bundled RKA fees, which equates to, on average, approximately $22 per participant per year.

108.   From the years 2016 to 2021, and because Defendants did not act with prudence, and as compared to other plans of similar sizes and with a materially iden-

tical level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $2,743,833 in unreasonable and excessive Bundled RK&A fees.

109.     From the years 2016 to 2021, based upon information derived from 404(a)(5) participant fee disclosures, and publicly available information reported on 5500 forms and the accompanying financial statements, because Defendants did not act prudently, and as compared to other Plans of similar sizes and with a materially identical level and quality of services, the Plan caused Plan Participants to suffer Losses (when accounting for compounding percentages/lost market investment opportunity) a total cumulative amount in excess of $4,844,037 in Bundled RKA fees.

110.     Alternatively, as set forth in the table below, from the years 2016 through 2021, based upon information provided by the Plan fiduciaries to Plan participants in the Plan 5500 Forms from Schedule H – "Contract Administrator Fees", the Plan paid an effective average annual Total RKA fee of $57 per participant. These amounts the Total RKA fees (the sum of the Bundled RKA fees and the A La Carte RKA fees):

### Total Recordkeeping and Administration (Total RKA) Fees

|  | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Average |
|---|---|---|---|---|---|---|---|
| Participants | 20,107 | 19,894 | 20,043 | 21,103 | 22,474 | 22,082 | 20,951 |
| Est. Total RKA Fees | $1,290,882 | $1,201,850 | $1,263,340 | $1,090,603 | $1,179,996 | $1,127,530 | $1,192,367 |
| Est. Total RKA Per Participant | $64 | $60 | $63 | $52 | $53 | $51 | $57 |

111.     The table below illustrates the annual Total RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of RKA services (that all mega plans

receive from recordkeepers), compared to the average annual Total RKA fees paid by the Plan (as identified in the table above).

**Comparable Plans' Total RKA Fees Based on Publicly Available Information from Form 5500**
(Price calculations are based on 2018 Form 5500 information or the most recent Form 5500 if 2018 is not available)

| Plan | Participants | Assets | Total RKA Fee | Total RKA Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Viacom 401(K) Plan | 12,196 | $1,249,874,734 | $376,314 | $31 | Great-West | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| Michelin Retirement Account Plan | 13,798 | $616,026,001 | $425,270 | $31 | Vanguard | White |
| Michelin 401(K) Savings Plan | 16,521 | $2,380,269,826 | $570,186 | $35 | Vanguard | White |
| Fedex Office and Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $486,029 | $26 | Great-West | White |
| JBS 401(K) Savings Plan | 19,420 | $374,330,167 | $481,539 | $25 | Great-West | White |
| **General Mills Plan Average Fee** | **20,951** | **$3,919,283,555** | **$1,192,367** | **$57** | **Aon/Alight** | **Red** |
| Sanofi U.S. Group Savings Plan | 24,097 | $5,522,720,874 | $558,527 | $23 | T. Rowe Price | White |
| The Rite Aid 401(k) Plan | 31,330 | $2,668,142,111 | $1,040,153 | $33 | Alight | White |
| Kindred 401 (K) Plan | 34,092 | $1,299,328,331 | $1,121,564 | $33 | T. Rowe Price | White |
| The Savings and Investment Plan | 34,303 | $2,682,563,818 | $1,130,643 | $33 | Vanguard | White |

| Danaher Corporation & Subsidiaries Savings Plan | 35,757 | $4,565,702,706 | $988,267 | $28 | Fidelity | White |
|---|---|---|---|---|---|---|

112.     The comparator Plans serviced by Alight and charged less received the same level and quality of services as Fidelity pointed out in the *Moitoso* case referred to above.

113.     From the years 2016 through 2021, the graph below illustrates the annual Total RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, compared to the average Total RKA fees paid by the Plan (as identified in the table above), with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



114. The Total RKA Fees paid by the comparable plans in the table above are derived from publicly available information reported in 5500 forms and the accompanying financial statements that are required to be filed with the Department of Labor and includes both *the direct and indirect compensation* received and retained by the recordkeepers for performing RKA services.

115. The more participants a plan has, the lower the effective fee per participant that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the Total RKA services.

116. When a plan fiduciary follows prudent practices as outlined by the Department of Labor and solicits bids from several recordkeepers in a competitive environment, some initial bids for the Total RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary should be able to negotiate a Total RKA fee lower than the trend line such that the Total RKA fee would be proximate to the trend line.

117. From the years 2016 to 2021, the table and graph above illustrate that the Plan paid an effective average annual Total RKA fee of at least $57 per participant.

118. From the years 2016 through 2021, and as compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting with prudence, the Plan actually would have paid significantly less than

an average of approximately $1,192, 367 per year in RKA fees, which equated to an effective average of approximately $57 per participant per year.

119.    From the years 2016 through 2021, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for RKA of approximately $649,481 per year in fees, which equates to approximately $31 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *almost twice* what they could otherwise pay for Total RKA services.

120.    From the years 2016 through 2021, the Plan additionally cost its participants on average approximately $542,901 per year in RKA fees, which equates to on average approximately $26 per participant per year.

121.    From the years 2016 to 2021, and because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $3,257,408 in unreasonable and excessive Total RKA fees.

122.    From the years 2016 to 2021, because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a materially identical level and quality of services, the Plan

actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $5,694,322 in Total RKA fees.

123.   Defendants could have received RKA services during the Class Period of the same level and quality from Alight or other recordkeepers that provide record-keeping services to mega plans, like the General Mills Plan, because both the Plan 5500 forms and the Plan fee disclosures establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above. There is no evidence, based on these Plan documents, that the Plan received any additional services.

124.   Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, no reasonable tradeoffs existed here because recordkeepers for mega plans are providing the exact same level and quality of services.

125.   Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Alight, and Defendants could have obtained the same Total and Bundled RKA services for less from other, similar recordkeepers.

126.   Plaintiff paid these excessive Total and Bundled RKA fees in the form of direct and indirect compensation to the Plan and suffered injuries to her Plan account as a result.

127.     Plaintiff has participated in several 401(k) plans from other employers and there have been no material differences in the services that she has received.

128.     Plaintiff does not need to provide examples of similar plans receiving the <u>same</u> services in the <u>same</u> year where the primary drivers of price in large plans are the number of accounts and whether the plan's fiduciaries solicited competitive bids, rather than the marginal cost of recordkeeping for each participant." *See Coyer et al. v. Univar Solutions USA Inc. et al.*, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022) (emphasis in original).

129.     "The fact that each of the other similarly-sized plans were receiving <u>at least</u> the same services for less provides the kind of circumstantial evidence sufficient to create an inference of imprudence." *Id.* (citing *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 332 (3d Cir. 2019)) (emphasis in original).

130.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the Total RKA fees it paid to Alight vis-à-vis the fees that other RKA providers would charge, and would have accepted, for the same level and quality of services.

131.     During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's Total and Bundled RKA fees it paid to Alight, but Defendants either simply failed to do so, or did so ineffectively, given that it paid nearly *two times more* than the Total and Bundled RKA fees than it should have.

132.    During the entirety of the Class Period, and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the Total and Bundled RKA fees it paid to Alight, it would have realized that the Plan was compensating Alight unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants, and therefore should have removed Alight as Plan recordkeeper.

133.    The Plan recordkeeping fees were also excessive relative to the recordkeeping services received, since the quality and level of such services are standard for mega 401(k) and 403(b) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in Total and Bundled RKA fees between comparable Plans is not explained by the level and quality of services each recordkeeper provides.

134.    The market for Total and Bundled RKA services for mega plans, like the General Mills Plan, is such that all national recordkeepers can provide all the required services that a mega plan might need. Any differences in the quality or scope of the services delivered are immaterial to the difference between what the Plan paid for Total and Bundled RKA services and what he reasonable fair market fee was for identical services.

135.    During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Total and Bundled RKA fees than they should have been and/or by failing to take effective remedial actions including removing Alight as the Plan recordkeeper, Defendants breached their

fiduciary duty of prudence to Plaintiff and Plan participants, causing millions of dollars of harm to Plaintiff and Class Member's retirement accounts.

## SELF DEALING

136.    General Mills is a fiduciary to the Plan because it exercises discretionary authority, responsibility, and control over the management and administration of the Plan, exercises authority and control over Plan assets, and appoints and removes Plan fiduciaries.

137.    Schedule D of the Plan's Form 5500s indicates that General Mills acts as an "investment manager" for several of the "white label" funds included as investment options in the Plan. General Mills is listed as a direct filing entity for the GMI Investment Trust-Pooled Equity, the GMI Investment Trust-Pooled International, the GMI Pooled Savings Fixed Fund, the General Mills Group Trust-PPEF, and the General Mills Group Trust PRAF.

138.    It is unclear why the Plan Form 5500 service code for these services is for "account maintenance" if the services were for "investment management." "Account Maintenance" is a recordkeeping function and should generally be done by the recordkeeper and can be done more cost effectively by the recordkeeper.

139.    If General Mills selected other investment options, the Plan would not have had to pay these account maintenance fees and/or the fees would have been lower and incorporated in the expense ratio of the investment option.

140.    General Mills is acting as the investment manager for the investments of their own employees and being compensated for it.  General Mills thereby violates

it duty of loyalty to the Plan and engaged in fiduciary prohibited transactions by selling proprietary investment products to their own employees for their own financial self-interest.

141.     Schedule C of the Plan's 5500 Forms establishes that General Mills paid itself for providing these "account maintenance" services to the Plan. Specifically, the following amounts were paid out of plan assets for contract administration to itself from 2016 through 2021:

**General Mills 401(K) Plan Form 5500 Schedule C - Direct Compensation**

| Provider | Relationship | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Total |
|---|---|---|---|---|---|---|---|---|
| GENERAL MILLS, INC. | PLAN ADMINISTRATOR | $662,161 | $671,706 | $510,160 | $380,983 | $413,456 | $262,302 | **$2,900,768** |

142.     The "plan administration" services purportedly provided to the Plan by General Mills could have been provided by Alight, who actually has the expertise in financial services, whereas General Mills is a cereal manufacturer.

143.     Instead, General Mills paid itself to act as an investment manager for several of the "white label" funds in the Plan in order to enrich itself in a conflicted manner with Plan assets.

144.     General Mills chose themselves as investment managers to create additional revenue for themselves and to help cover the costs of the salaries of GM employees who selected and monitored their own investment options.

145.     General Mills paid itself over $2.9 million dollars in Plan assets during the Class Period under Service Code 65 for "account maintenance fees," which involved selling proprietary investment products to their own employees for their own financial self-interest.

146.     There is also a significant overlap between recordkeeping services, which according to the 2021 General Mills Annual Fee Disclosure is a part of "administrative expenses" and includes "recordkeeping, communication materials, Internet services, and assisting participants with transactions," and "account maintenance fees," which are defined by the Department of Labor as sometimes being "used to cover administrative expenses." *See* A Look at Plan Fees, U.S. Department of Labor, at 4, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited Oct. 14, 2022).

147.     General Mills' payment of these investment management/account maintenance fees to itself out of plan assets represents self-dealing and a clear conflict of interest with the Plan and Plan participants and violates its duty of loyalty to Plan participants under ERISA Section 404(a)(1)(A); 29 U.S.C. § 1104(a)(1)(A).

148.     The payments to itself of these investment management/account maintenance fees also constitutes a fiduciary prohibited transaction by General Mills as a fiduciary to the Plan. ERISA Section 406(b), 29 U.S.C. §1106(b)(1).

149.     General Mills is obligated to disgorge to the Plan all amounts it received in investment management/account maintenance fees and must make good to the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been restored to the Plan. ERISA Section 409(a), 29 U.S.C. §1109(a).

## CLASS ACTION ALLEGATIONS

150.     29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

151.     In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representative of, the following Class:

> All participants and beneficiaries of the General Mills 401(k) Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning October 14, 2016, and running through the date of judgment.

152.     The Class includes approximately 21,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

153.     There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

    a.    Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

    b.    Whether Defendants breached their fiduciary duties to the Plan;

    c.    What are the losses to the Plan resulting from each breach of fiduciary duty; and

    d.    Whether Defendants engaged in a fiduciary prohibited transaction when it engaged in self-dealing; and

e.   What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of fiduciary duty and engaging in prohibited transactions.

154.   Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

155.   Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because she is a participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

156.   Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

157.     Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

158.     Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

159.     The claims brought by the Plaintiff arises from fiduciary breaches and prohibited transactions as to the Plan in its entirety and does not involve mismanagement of individual accounts.

160.     The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in individual participants' Plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

161.     Under ERISA, an individual "participant" or "beneficiary" is distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

162.     Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and

where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

## FIRST CLAIM FOR RELIEF
### Breach of Duty of Prudence of ERISA, as Amended
### (Plaintiff, on behalf of herself and Class, Against Defendants Brunson and Committee Defendants – RKA Fees)

163. Plaintiff restates the above allegations as if fully set forth herein.

164. Defendants Brunson and Committee are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

165. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants Brunson and Committee in their administration of the Plan.

166. Defendants Brunson and Committee, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable RKA fees.

167. During the Class Period, Defendants Brunson and Committee had a fiduciary duty to do all of the following: ensure that the Plan's RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

168. During the Class Period, Defendants Brunson and Committee breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

169. During the Class Period, Defendants Brunson and Committee further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper,

Alight, to make sure it was providing the RKA services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable levels.

170.    During the Class Period, Defendants Brunson and Committee breached their duty to Plan participants, including to Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

171.    Defendants Brunson and Committee's failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

172.    As a result of Defendants Brunson and Committee's breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered tens of millions of dollars in objectively unreasonable and unnecessary monetary losses.

173.    Defendants Brunson and Committee are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the General Mills Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches

of fiduciary duties alleged in this Count. In addition, Defendants Brunson and Committee are subject to other equitable relief as set forth in the Prayer for Relief.

### SECOND CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of herself and Class, Against Defendants**
**General Mills and Board – RKA Fees)**

174.     Plaintiff restates the above allegations as if fully set forth herein.

175.     Defendants General Mills and Board had the authority to appoint and remove members or individuals responsible for Plan RKA fees on the Committee and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

176.     In light of this authority, Defendants General Mills and Board had a duty to monitor those individuals responsible for Plan RKA fees on the Committees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

177.     Defendants General Mills and Board had a duty to ensure that the individuals responsible for Plan RKA fees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's RKA fees; and reported regularly to Defendant General Mills and Board.

178.   The objectively unreasonable and excessive RKA fees paid by the Plan inferentially establish that Defendants General Mills and Board breached their duty to monitor by, among other things:

a.   Failing to monitor and evaluate the performance of individuals responsible for Plan RKA fees on the Committees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably RKA expenses;

b.   Failing to monitor the process by which the Plan's recordkeeper, Alight, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c.   Failing to remove individuals responsible for Plan RKA fees on the Committees whose performance was inadequate in that these individuals continued to pay the same RKA costs even though solicitation of competitive bids would have shown that maintaining Alight as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiff's and other Plan participants' retirement savings.

179.   As the consequences of the breaches of the duty to monitor for RKA fees the Plaintiff and Plan participants suffered tens of millions of dollars of objectively unreasonable and unnecessary monetary losses.

180.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants General Mills and Board are liable to restore to the General Mills Plan all losses caused by their failure to adequately monitor individuals responsible for Plan RKA fees on the Committee. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## THIRD CLAIM FOR RELIEF
### Fiduciary Prohibited Transactions under ERISA, as Amended, And Breach of Duty of Loyalty of ERISA, as Amended
### (Plaintiff, on behalf of herself and Class, Against Defendant General Mills)

181. Under ERISA Section 404(a)(1)(A), "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).

182. Under ERISA Section 406(b)(1), "[a] fiduciary with respect to a plan shall not— (1) deal with the assets of the plan in his own interest or for his own account." 29 U.S.C. § 1106(b)(1).

183. Defendant General Mills, as fiduciary to the Plan, did not discharge its duties with respect to the Plan solely in the interest of Plan participant benefits and for the exclusive purpose of providing benefits to participants and their beneficiaries, instead engaging in self-dealing and unlawfully paying itself from plan assets, for investment manager/account maintenance services that should have and could have been provided by Alight.

184. Defendant General Mills dealt with the assets of the Plan in its own interest and for its own account by diverting plan assets to itself instead of using the Plan assets for the exclusive benefit of Plan participants. ERISA Section 404(a)(1)(A); 29 U.S.C. §1104(a)(1)(A), thereby breaching its duty of loyalty to the Plan.

185. The payments to itself for purported "plan administrator" service purposes constitute a fiduciary prohibited transaction by General Mills as a fiduciary to

the Plan because General Mills dealt with the assets of the plan for its own interest and for its own account to enrich itself.

186.     General Mills is obligated to disgorge to the Plan all amounts it received in the form of these account maintenance fees and must make good to the Plan all losses the Plan suffered from being deprived of those assets, namely, the gains the Plan would have earned had those amounts been restored to the Plan. 29 U.S.C. §1109(a); *Barboza v. California Assn. of Prof. Firefighters*, 799 F.3d 1257, 1269 (9th Cir. 2015); *Hi-Lex Controls, Inc. v. Blue Cross Blue Shield of Michigan*, 751 F.3d 740, 750 (6th Cir. 2014).

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.     A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable RKA fees and for engaging in self-dealing, and restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An Order requiring General Mills to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §

1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against General Mills as necessary to effectuate relief, and to prevent General Mills' unjust enrichment;

F.    An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.    Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary/consultant or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.    An award of pre-judgment interest;

I.    An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.    Such other and further relief as the Court deems equitable and just.


                          Respectfully submitted,

Date: January 6, 2023          /s Paul M. Secunda

                          WALCHESKE & LUZI, LLC

                          Paul M. Secunda
                          (*admitted pro hac vice*)
                          235 N. Executive Dr., Suite 240
                          Brookfield, Wisconsin 53005
                          Telephone: (414) 828-2372

                          MILLER & STEVENS, P.A.

                          Amy R. Mason, Esq. (#0347760)
                          92 Lake Street  S.
                          Forest Lake, MN 55025
                          Telephone: (651) 462-0206
                          amy@millerstevens.com

                          *Attorneys for Plaintiff and Proposed Class*